VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF DANVILLE

**Susan O. Cardoza,**

Plaintiff,

v.

**Medical Device Business Services, Inc.**
**(Formally DePuy Orthopedics Inc.)**
**700 Orthopaedic Drive**
**Warsaw, IN 46581**

and

**Johnson & Johnson Services, Inc.**
**(Johnson & Johnson)**
**One Johnson & Johnson PLZ**
**New Brunswick, NJ 08933**

and

**DePuy Synthes Sales, Inc.**
**325 Paramount Drive**
**Raynham, MA 02767**

and

**CeramTec GmbH**
**CeramTec – Platz 1-9**
**73207, Plochingen**
**Germany**

and

**CeramTec North American Corp.**
**CeramTec Subsidiary, American Headquarters**
**One Technology Place**
**Laurens, SC 29360**

and

**Danville Regional Medical Center, LLC**
**(d/b/a SOVAH Danville)**
**103 Powell Ct., Ste 200**
**Brentwood, TN 37027**

and

**COMPLAINT**
Case No. CL18-850

FILED
2018 DEC 13 PM 12:00
CLERK'S OFFICE
CIRCUIT COURT
DANVILLE, VIRGINIA

LAW OFFICES
YOUNG, HASKINS, MANN,
GREGORY, MCGARRY
& WALL, P.C.
MARTINSVILLE, VA

**Spectrum Medical Inc.**
**109 Bridge Street, Suite 300**
**Danville, VA 24541**

and

**Matt Wimbish**
**Roanoke, Virginia**

Defendants

COMES NOW the Plaintiff, Susan Olival Cardoza, by counsel, and respectfully alleges as follows:

**PARTIES**

1. Plaintiff is a United States citizen residing in Danville, Virginia. (hereafter sometimes, "patient" or "Plaintiff")

2. Defendant, Medical Device Business Services, Inc. is a corporation organized and incorporated in Indiana with its primary place of business in Warsaw, Indiana. This corporation developed, designed, tested, manufactured, distributed and sold the hip implant which is the subject of this lawsuit. (hereafter "DePuy" or " DePuy defendants")

3. Defendant, Johnson & Johnson Services, Inc. is a corporation organized and existing under the law of New Jersey with its primary place of business in New Brunswick, New Jersey. As DePuy's parent company this company was involved in the development, design, testing, manufacturing, distributing and sale of the hip implant which is the subject of this lawsuit. (hereafter "J&J")

4. Defendant, DePuy Synthes Sales, Inc. is a subsidiary, affiliate and/or sister corporation of Johnson & Johnson. Upon information and belief, this company distributed and sold the hip implant which is the subject of this lawsuit. (hereafter "DePuy Sales" or "DePuy defendants")

5. Defendant, CeramTec GmbH, is a company that produces pink-colored ceramic hip implant components sold under the name BIOLOX Delta. This company sells these products to original equipment manufacturers such as, and including, the DePuy and J&J defendants. The DePuy and J&J defendants incorporate BIOLOX Delta products into hip implant systems that DePuy and J&J in turn sells to hospitals and orthopedic surgical groups for use by surgeons in orthopedic surgeries. (hereafter "CeramTec")

LAW OFFICES
YOUNG, HASKINS, MANN,
GREGORY, MCGARRY
& WALL, P.C.
MARTINSVILLE, VA

6. Defendant, CeramTec North American Corp. is a subsidiary or affiliate corporation of CeramTec GmbH having a United States presence in Laurens, South Carolina. Upon information and belief, this company distributes and sells CeramTec hip implant products, including the products sold herein, in the United States. (hereafter "CeramTec Sales" or "CeramTec defendants")

7. Defendant, Danville Regional Medical Center, is a subsidiary of LifePoint Health Systems whose primary place of business is Brentwood, Tennessee. This defendant operates the hospital in Danville, Virginia. (hereafter "Hospital")

8. Defendant, Spectrum Medical Inc. is a healthcare provider in the Commonwealth of Virginia whose services include, among other things, orthopedic surgery. (hereafter "Spectrum")

9. Defendant, Matt Wimbish, at all pertinent times, was a manufacturer's representative for the DePuy defendants. At all pertinent times, this defendant resided in Virginia. (hereafter "Wimbish")

## JURISDICTION AND VENUE

10. This Court has personal jurisdiction over the DePuy and J&J defendants because they are authorized to do business and in fact do business in this state. These defendants and CeramTec have sufficient minimum contacts with this state and otherwise purposefully avail themselves of the markets in this state through the promotion, marketing, and sale of its hip implant products in Virginia. This Court has Long-arm jurisdiction over CeramTec pursuant to Virginia Code § 8.01-328.1, paragraphs 2, 4, and 5.

11. This Court has subject matter jurisdiction over this action, pursuant to VA. Code §17.1-513.

12. The proper venue for this case lies in Danville inasmuch as the Hospital and Spectrum, have principle places of business located in Danville, Virginia.

## FACTS

13. Sometime prior to December 15, 2016, the J&J and DePuy defendants, and the CeramTec defendants, developed, designed, tested, manufactured, distributed, sold, and placed in the stream of commerce a ceramic-on-ceramic total hip replacement prosthesis which is the subject of this lawsuit. Said prosthesis is known as CERMAX Ceramic Total Hip System and is specifically identified by the package "sticker" labeling attached. (Exhibit A). This prosthesis will be hereafter referred to as "the product".

14. On or about December 15, 2016, the defendant Hospital and/or the Spectrum defendant resold the product to the patient, and her surgeon implanted the product in her body during a total hip replacement.

LAW OFFICES
YOUNG, HASKINS, MANN,
GREGORY, MCGARRY
& WALL, P.C.
MARTINSVILLE, VA

15. The hip is a ball-and-socket joint, where the ball is the femoral head and the socket is formed by the acetabulum.

16. In a total hip replacement, surgeons remove damaged biological material and implant prosthetic components.

17. In the product which is the subject of this lawsuit, the liner which is part of the acetabulum component, and the femoral head were made of ceramic material by CeramTec.

18. In the product which is the subject of the lawsuit, the ceramic femoral head and liner were manufactured and placed in the stream of commerce by the CeramTec. These component parts were sold to the J&J and DePuy defendants and were used and relied upon in the manufacture and sale of the product.

19. On or about December 15, 2016, the patient underwent a total hip replacement procedure at the Hospital.

20. At the time and place aforesaid, the product was implanted in the patient's body by a surgeon who was an employee and agent of Spectrum, acting within the scope of his employment, authority and agency. (hereafter "surgeon")

21. On or about March 3, 2017 the patient presented to Spectrum reporting "a squeaking pain and increasing pain of her hip". It appeared to Spectrums' orthopedic clinician "that the acetabular liner has displaced completely and is rotated".

22. On or about March 7, 2017, the patient presented again to her original surgeon, at Spectrum, with continued history of increasing hip pain making it even difficult to sleep. Her surgeon concluded that there had been "a fracture of the ceramic liner".

23. After physical examination and x-ray imaging, the surgeon determined that the product had probably malfunctioned and emergent revision surgery was indicated.

24. On or about March 10, 2017, the patient presented to the Hospital for emergent revision surgery.

25. Prior to surgery, the patient specifically told her surgeon that she would like to have the parts that were to be removed from her body, and requested that said explants be given to her. Her surgeon agreed that the product would be preserved and given to the patient.

26. During the revision surgery, the surgeon found that the ceramic liner had indeed "fractured in multiple planes" and that sharp dangerous fragment shards had been deposited in the patient's body.

27. During the revision surgery, the surgeon removed the ceramic head and shattered ceramic liner, and replaced said components with non-ceramic implants.

28. To the best of the surgeon's ability he removed the shattered ceramic fragments and shards. However, despite his best efforts, all of the dangerous shards could not be removed.

29. At the time of the revision surgery, while the patient was under general anesthesia, the defendant Wimbish took possession of the shattered pieces of the ceramic liner which had been removed from the patient's body. In so doing, defendant Wimbish was acting within the scope of his employment and/or agency with the DePuy defendants, and his actions were in furtherance of DePuy's interests.

30. The patient paid for the product. When it was implanted in her body on or about December 15, 2016, the product thereafter belonged to her.

31. Neither DePuy nor defendant Wimbish had the patient's permission, authorization, or consent to take possession of the product.

32. The ceramic head was retained by the hospital. By report, the head was cracked, but not shattered.

33. Since March 10, 2017, the patient has been hospitalized on several occasions for hip related complications stemming from her original surgery. The patient has undergone a second revision surgery at an outside hospital. Subsequent treating physicians have been unable to remove the remaining dangerous shattered ceramic fragment shards from her body.

34. Upon information and belief, the shattered fragments taken by defendant Wimbish have been examined, inspected, and tested in an attempt to determine the root cause of the failed prosthesis. It is believed, and therefore averred and alleged, that examination, inspection and testing of the failed product took place in Warsaw, Indiana and in Leeds, England. The chain of custody is unknown.

35. On April 7, 2017, lawyers then representing the patient sent a Preservation of Evidence/Spoliation notice letter to the Hospital. (Exhibit B).

36. Upon information and belief, the hospital still has physical possession of the cracked femoral head, which was removed from the patient's body.

37. The hospital has failed and refused to allow the patient to take possession of the femoral head without a "subpoena".

38. On or about April 18, 2017, lawyers then representing the patient sent a Preservation of Evidence/Spoliation notice letter to the DePuy defendants. (Exhibit C).

39. Despite follow-up written requests on July 24, 2017, November 6, 2017 and February 5, 2018, and numerous telephone calls to DePuy, there was no meaningful response

LAW OFFICES
YOUNG, HASKINS, MANN,
GREGORY, MCGARRY
& WALL, P.C.
MARTINSVILLE, VA

whatsoever except to identify the attorney who was handling the matter for DePuy until November 23, 2018.

40. Subsequently, despite continuing requests for the results of DePuy's examination, testing, and inspection of the ceramic liner, DePuy has failed and refused to make this information available to the Plaintiff.

41. On or about November 23, 2018, the DePuy defendants belatedly caused to be delivered to the Plaintiff's agent what purported to be the shattered components of the Plaintiff's explanted prosthesis. The fragments and shattered pieces were in an unsecured Ziploc bag with insufficient and confusing identifying information.

42. The DePuy defendants knew that, under these circumstances, at this point in time, it would be virtually impossible for the Plaintiff to determine with reasonable certainty the root cause of her injuries and damage.

43. The product is a Class III medical device which, by definition, is a product having an unreasonable risk of serious bodily injury or death unless approved manufacturing processes are strictly adhered to.

44. During clinical trials, required by the FDA, before marketing the product, the DePuy defendants reported isolated ceramic liner "fracture" to have been observed on x-ray only after more than 18 months of duration of implantation. Subsequent surveillance and reporting of ceramic line "fracture" have provided similar information.

45. Isolated "fracture" is materially different from a ceramic liner "shattering" into many pieces as occurred in the Plaintiff's hip after less than three months of implantation.

46. It is highly unlikely that a ceramic liner would "shatter", as in this case, if the DePuy defendants, during the manufacturing process, had appropriately followed their own protocol as approved by the FDA.

47. The product was in substantially the same condition when implanted in the patient's body as it was when it left the hands of the defendants.

**COUNT I**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY BY DEPUY AND J&J DEFENDANTS**

48. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

49. At all times relevant to this action, all defendants were merchants with regard to the product at issue.

Law Offices
Young, Haskins, Mann, Gregory, McGarry & Wall, P.C.
Martinsville, VA

50. Said defendants impliedly warranted that the product they either designed, selected, produced, inspected, tested, manufactured, packaged, marketed, distributed, and sold was merchantable under applicable law.

51. Said defendants breached this implied warranty of merchantability because the product was defective, unreasonably dangerous, and neither fit, suitable nor safe for the ordinary purposes for which it was intended, and would not pass without objection in the industry in which it was sold. In this, among other things, in manufacturing the product the DePuy defendants failed to adhere to FDA approved processes and procedures causing a manufacturing defect. Stated differently, the product the patient received was not the product approved by the FDA because defendants did not adhere to FDA manufacturing requirements.

52. As a direct and proximate result of these defendants having breached an implied warranty of merchantability, the patient has suffered injuries and damages described in this Complaint.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE BY DEPUY AND J&J DEFENDANTS

53. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

54. At all times relevant to this action, these defendants knew or had reason to know that purchasers of the product would be using it in connection with hip replacement, thus relying upon their representation that it was reasonably safe for this particular purpose.

55. Said defendants impliedly warranted that the product they either designed, selected, produced, inspected, tested, manufactured, packaged, marketed, distributed, and sold was fit for the purpose of hip replacement when in fact, it was not.

56. Said defendants breached this implied warranty of fitness for a particular purpose because the product was defective, unreasonably dangerous, and neither fit, suitable nor safe for the particular purpose for which it was manufactured and sold. In this, among other things, in manufacturing the product the DePuy and J&J defendants failed to adhere to FDA approved processes and procedures causing a manufacturing defect. Stated differently, the product the patient received was not the product approved by the FDA because defendants did not adhere to FDA manufacturing requirements.

57. As a direct and proximate result of these defendants' having breached an implied warranty of fitness for a particular purpose, the patient has suffered injuries and damages described in this Complaint.

LAW OFFICES
YOUNG, HASKINS, MANN,
GREGORY, MCGARRY
& WALL, P.C.
MARTINSVILLE, VA

**COUNT III**
**BREACH OF IMPLIED WARRANTY MERCHANTABILITY BY CERAMTEC**

58. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

59. At all times relevant to this action, all defendants were merchants with regard to the product at issue.

60. Said defendants impliedly warranted that the product they either designed, selected, produced, inspected, tested, manufactured, packaged, marketed, distributed, and sold was merchantable under applicable law.

61. Said defendants breached this implied warranty of merchantability because the product was defective, unreasonably dangerous, and neither fit, suitable nor safe for the ordinary purposes for which it was intended, and would not pass without objection in the industry in which it was sold.

62. As a direct and proximate result of these defendants having breached an implied warranty of merchantability, the patient has suffered injuries and damages described in this Complaint.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE BY CERAMTEC**

63. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

64. At all times relevant to this action, these defendants knew or had reason to know that purchasers of the product would be using it in connection with hip replacement, thus relying upon their representation that it was reasonably safe for this particular purpose.

65. Said defendants impliedly warranted that the product they either designed, selected, produced, inspected, tested, manufactured, packaged, marketed, distributed, and sold was fit for the purpose of hip replacement when in fact, it was not.

66. Said defendants breached this implied warranty of fitness for a particular purpose because the product was defective, unreasonably dangerous, and neither fit, suitable nor safe for the particular purpose for which it was manufactured and sold.

67. As a direct and proximate result of these defendants' having breached an implied warranty of fitness for a particular purpose, the patient has suffered injuries and damages described in this Complaint.

LAW OFFICES
YOUNG, HASKINS, MANN,
GREGORY, MCGARRY
& WALL, P.C.
MARTINSVILLE, VA

**COUNT V**
**FAILURE TO WARN BY CERAMTEC**

68. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

69. These defendants knew, or had reason to know, that the product would be utilized by orthopedic surgeons and patients in the exact fashion as set forth in this Complaint.

70. These defendants knew, or had reason to know, that without more explicit warnings to surgeons and patients there was an unreasonable risk of breaking, fracture, and shattering of the product. In spite of the unreasonable condition of said product without more explicit warnings, these defendants failed to provide adequate warnings and instructions to patients and surgeons.

71. As a direct and proximate result of these defendants' having failed to warn, the patient has suffered injuries and damages described in this Complaint.

**COUNT VI**
**BREACH OF EXPRESS WARRANTIES BY CERAMTEC**

72. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

73. These defendants made certain expressed warranties which falsely minimized the products propensity to break, fracture, and shatter. Among other things, theses defendants misleadingly characterized the product as being comparable to steel in hardness.

74. The patient's surgeon, and indirectly the patient, relied upon this type of expressed warranty to the patient's detriment.

75. These defendants breached their expressed warranties in that the product did not conform to the warranties made by these defendants.

76. As a direct and proximate result of these defendants' having breached the expressed warranty, the patient has suffered injuries and damages described in this Complaint.

**COUNT VII**
**SPOLIATION BY DEPUY AND J&J DEFENDANTS**

77. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

78. Ceramics are inherently vulnerable to breakage, fracture, and shattering. Although improvements in materials engineering had greatly reduced fracture rates in ceramic

Law Offices
Young, Haskins, Mann, Gregory, McGarry & Wall, P.C.
Martinsville, VA

femoral heads at the time of the patient's surgery, concerns still existed for ceramic liners at this point in time.

79. Knowing these concerns, commencing with the wrongful conversion of the patient's explanted shattered component, and unauthorized analysis use of the patient's medical records, these defendants embarked on a course of conduct intended and designed to conceal the results of their investigation and testing thereby frustrating, and depriving the patient of her right and opportunity to prove a cause of action for products liability. Stated differently, these defendants have suppressed material evidence most likely favorable to the patient. This wrongful course of action continues to this date. In this, among other things, these defendants have thwarted Plaintiff's right to conduct her own investigation as to the cause of her injury and damage; have failed and refused to share with the patient the results of their root cause investigation and testing; and have made use of the Plaintiff's property and confidential records for their own benefit.

80. These defendants have failed to properly and completely report to the FDA the results of their root cause analysis and testing.

81. Where, as here, these defendants have within their control material evidence and do not disclose it, there is an inference, that the evidence, if it were disclosed, would be unfavorable to the defendants.

82. The defendants knew that evidence which has been suppressed, and continues to be suppressed, is crucial to the Plaintiff's underlying action for products liability.

83. As a direct and proximate result of this wrongful course of action (spoliation), the patient has suffered injuries and damages described in this Complaint.

## COUNT VIII
## WRONGFUL DISCLOSURE OF MEDICAL INFORMATION BY ALL DEFENDANTS EXCEPT CERAMTEC

84. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

85. At all pertinent times, all persons in control of, in possession of, or exercising dominion over the Plaintiff's explanted components and the Plaintiff's medical records were employees or agents of the Hospital defendant and/or the Spectrum defendant, acting within the scope of their employment, agency, and authority. In this, among other things, no such person was pursuing his own ends, or had external, independent or personal motives; such persons were performing a normal function of their assigned service or task; and, the breach of duty occurred during the very thing the person was being paid to do. Breach of duty occurred while engaged in the very thing the person was being paid to do.

Law Offices
Young, Haskins, Mann, Gregory, McGarry & Wall, P.C.
Martinsville, VA

86. DePuy is liable under the doctrine of *respondeat superior* (master servant) for all wrongful acts and omissions of such person. The acts and omission of such persons were intended only to serve the purposes of the Hospital and Spectrum.

87. The Hospital and Spectrum Defendants owed a duty to the Plaintiff not to disclose information gained from the Plaintiff during the course of treatment without the Plaintiff's authorization.

88. These Defendants breached this duty by, among other things (a) allowing the Defendant Wimbish to wrongfully take possession of the explanted component (b) violating HIPAA and also HITECH laws and regulations, and common law duties, in disclosing the Plaintiff's confidential medical information to the DePuy defendants.

89. In breaching this duty of care, these Defendants facilitated, were implicit in, and aided and abetted the wrongful conversion and use of the Plaintiff's property and medical records by the DePuy defendants.

90. As a direct and proximate result of this wrongful course of action (disclosure of medical information), the patient has suffered injuries and damages described in this Complaint.

**COUNT IX**
**WRONGFUL CONVERSION BY ALL DEFENDANTS EXCEPT CERAMTEC**

91. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

92. In taking possession of the explanted shattered hardware component, the defendant Wimbish and his employer/principle wrongfully exercised and assumed authority over the Plaintiff's property with intent to deprive the Plaintiff of her right and opportunity to determine the cause of her injuries and damage.

93. Thereafter, despite repeated written and verbal requests, the DePuy and J&J defendants wrongfully failed and refused to provide any meaningful information to the Plaintiff or to heed her requests, from March 10, 2017 until November 23, 2018. These defendants to this day have wrongfully failed and refused to provide the results of the root cause analysis and testing.

94. The DePuy defendants ratified and approved the wrongful conversion of Plaintiff's property by Defendant Wimbish.

95. By wrongfully converting the Plaintiff's property to their own use, the DePuy defendants, in equity, impliedly promised to share with the Plaintiff the results of their examination, inspection, and testing.

96. The DePuy defendants, having assumed possession of the fractured explants (along with the Plaintiff's confidential medical records) were under a duty to investigate and

LAW OFFICES
YOUNG, HASKINS, MANN, GREGORY, MCGARRY & WALL, P.C.
MARTINSVILLE, VA

determine the root cause of the product failure and to report their findings to the Food & Drug Administration (FDA) and to the Plaintiff.

97. In addition to the wrongful conversion of the Plaintiff's explanted failed hip component the DePuy Defendants wrongfully acquired the Plaintiff's personal health information (confidential medical records) without the Plaintiff's authorization, permission, or consent.

98. The Hospital and Spectrum Defendants were complicit in, facilitated, and aided and abetted wrongful conversion of the fractured implant. In this, among other things, these defendants allowed the Defendant Wimbish to take possession of the failed explanted component, and leave the premises; and these Defendants, without authorization, delivered to the DePuy Defendants, or allowed DePuy Defendants to take possession of Plaintiff's confidential medical records.

99. As a direct and proximate result of this wrongful course of action (conversion), the patient has suffered injuries and damages described in this Complaint.

## COMPENSATORY DAMAGES AS TO ALL DEFENDANTS

100. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

101. As a direct and proximate result of the acts and omissions of the DePuy and J&J defendants, and the CeramTec defendants, as set forth in Counts I, II, III, IV, V, and VI, the Plaintiff has been required to incur medical and related expense in the past, and will require even further such expenses in the future; has suffered in the past, and continues to suffer, and will suffer in the future severe emotional and mental anguish and distress with physical inconvenience and other physical ramifications, all attributable to the aforesaid acts and omissions, breaches of warranties and other actions described in Counts I through VI; the Plaintiff suffered specific direct injury to her person; was caused other serious and permanent injuries about her person internally and externally; was caused excruciating pain and mental anguish; was maimed and disabled; and, was rendered less capable of performing her normal daily tasks all due to her damage.

102. As a direct and proximate result of the spoliation, wrongful disclosure of medical information, and wrongful conversion by all defendants except CeramTec, as set forth in Counts VII, VIII, and IX, the Plaintiff has lost a fair and timely opportunity to prove her underlying products liability claim; has been deprived of her property; and has suffered an invasion of her privacy; and has been otherwise thwarted and frustrated in her attempts to prove the cause of her injury and damage, all of which has caused the Plaintiff great mental anguish and distress.

LAW OFFICES
YOUNG, HASKINS, MANN,
GREGORY, MCGARRY
& WALL P.C.
MARTINSVILLE, VA

## PUNITIVE DAMAGES AS TO DEPUY AND J&J DEFENDANTS

103. Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

104. The aforesaid acts and omissions attributable to the DePuy and J&J defendants, as set forth in Counts VII, VIII, and IX, constitute willful and wanton conduct; that is, acting consciously in disregard of civil obligations and the Plaintiff's rights, or acting with reckless indifference to the consequences. These defendants conduct and course of action was so willful and wanton that it shows a conscious disregard of the rights of others. There are severe criminal and civil penalties for HIPAA violations. The tort of conversion, as in this case, is tantamount to grand larceny.

WHEREFORE, Plaintiff moves the Court for judgment against the Defendants jointly and severally for compensatory damages in the amount of $2,500,000.00 (Two million five hundred thousand dollars) prejudgment and other interest as may be appropriate, and her cost in this behalf expended; Plaintiff further moves the Court for punitive damages in the amount of $350,000.00 (Three hundred fifty thousand dollars).

A TRIAL BY JURY IS REQUESTED.

Respectfully submitted,

SUSAN O. CARDOZA

By: ______________________
Of Counsel

Robert W. Mann, Esquire (VSB #07622)
YOUNG, HASKINS, MANN, GREGORY, MCGARRY & WALL, P.C.
Post Office Box 72
Martinsville, VA 24114-0072
Telephone (276)-638-2367
Facsimile (276)-638-1214
Email: RWMann@comcast.net

## DO NOT USE ABBREVIATIONS:

U, QD, QOD, trailing zero (1.0mg), µg, lack of leading zero (.1 mg), MS, MSO4, MgSO4

| TIME | |
|---|---|
| 1000 | REF 1246-03-000 LOT D16081836 2026-07-31 APEX™ HOLE ELIMINATOR - PS STERILE R QTY 1 (01)10603295019688 (17)260731(10)D16081836 DePuy Orthopaedics, Inc. 700 Orthopaedic Drive Warsaw IN 46582 1-800-366-4143 REV.F — Right total hip |
| | REF 1217-31-052 LOT C91788 STERILE R 2026-09-30 PINNACLE® 100 ACETABULAR SHELL 100 52mm OD GRIPTION™ QTY 1 (01)10603295010203 (17)260930(10)C91788 REV.D |
| | REF 1218-87-652 LOT 8388193 STERILE R 2021-08-31 CERAMAX™ Ceramic Insert NEUTRAL 52mm OD 36mm ID QTY 1 (01)10603295012511 (17)210831(10)8388193 REV.C |
| | REF 1365-36-310 LOT 8398876 STERILE R 2021-09-30 BIOLOX® DELTA CERAMIC FEMORAL HEAD +1.5 36mm DIA 12/14 TAPER QTY 1 (01)10603295033615 (17)210930(10)8398876 REV.E |
| | REF 3L92510 LOT 5259977 STERILE R 2020-10-31 CORAIL® HIP SYSTEM CEMENTLESS FEMORAL STEM HA COATED 12/14 AMT 135° STANDARD NO COLLAR KS SIZE 10 QTY 1 (01)10603295160768 (17)201031(10)5259977 DePuy France SAS REV.H |

FILED 2018 DEC 13 PM 12:00 CLERK'S OFFICE CIRCUIT COURT DANVILLE VIRGINIA

PLAINTIFF'S EXHIBIT A.

ALL-STATE LEGAL

USE BLACK INK ONLY

Patient Information/Label

CARDOZA, SUSAN MARIE

Physician's Progress Report

# PROGRESS RECORD

**DO NOT USE ABBREVIATIONS:**

IU, QD, QOD, trailing zero (1.0mg), µg, lack of leading zero (.1 mg), MS, MSO4, MgSO4

| | TIME | |
|---|---|---|
| 7 | 955 | REF 1221-36-482 LOT C20480 STERILE GP 2021-03-31 PINNACLE® ALTRX® POLYETHYLENE ACETABULAR LINER +4 NEUTRAL 36mm ID 52mm OD QTY 1 (01)10603295018488 (17)210331(10)C20480 REV. E DePuy Orthopaedics, Inc. 700 Orthopaedic Drive Warsaw IN 46582 [illegible] — Right hip |
| | | REF 1365-51-000 LOT 8391060 STERILE R 2021-09-30 M-SPEC™ METAL FEMORAL HEAD Ø36mm +1.5 12/14 TAPER QTY 1 (01)10603295033912 (17)210930(10)8391060 REV. E DePuy (Ireland) Loughbeg, Ringaskiddy Co. Cork, Ireland |
| 7 | 9:30 | [illegible] |
| | | [illegible] well |
| | | [illegible] Hb 9.5 |
| | | [illegible] |

-473-3789

USE BLACK INK ONLY

CORMDM00629560

PNSCAN

DM2805732934

# LUIS A. ABREU, PLLC

ATTORNEYS AT LAW

Luis A. Abreu
labreu@luisabreulaw.com

Michael D. Simmons
msimmons@luisabreulaw.com

P. O. Box 1598
626 North Ridge Street
Danville, Virginia 24543
www.luisabreulaw.com

(434) 791-4677
Fax: (434) 791-4676

April 7, 2017

FILED
2018 DEC 13 PM 12:00
CLERK'S OFFICE
CIRCUIT COURT
DANVILLE, VIRGINIA

VIA U.S. Mail and Certified Mail, Return Receipt Requested

Danville Regional Medical Center
142 South Main Street
Danville, VA 24541

**Preservation of Evidence/ Spoliation Notice**

| RE: | Our Client: | Susan Olival Cardoza |
|---|---|---|
| | Address: | 172 Graymont Place<br>Danville, VA 24541 |
| | Date of Birth: | 12/19/1953 |
| | Social Security #: | ###-##-0687 |

Dear Sir/Madam:

Please be advised that we represent Susan Cardoza with respect to her injuries sustained from a failed hip replacement performed on December 15, 2016. Please provide us with a complete copy of your file regarding services rendered to Ms. Cardoza including, but not limited to, office notes, radiology reports, diagnostic reports, disability slips, prescriptions, statement of account with CPT and ICD-9 codes, etc. Please also provide us with copies of all documentation relating to the hip replacement and parts used in the hip replacement surgery. Enclosed is an original of Danville Regional Medical Hospital's Authorization For Release Of Protected Health Information which has been signed by Ms. Cardoza.

This letter is to also put Danville Reginal Medical Hospital on notice that it must preserve all data of any type relating to the claim. Most importantly, all of the hip replacement parts removed during the operation must be preserved. This includes the CERAMAX Ceramic Insert, BIOLOX Delta Ceramic Femoral Head, and any other part that was replaced on March 10, 2017. Please ensure this letter is provided to the appropriate person in your office who is charged with the custody of the above items.

Please do not dispose of any of this material, as I expect that it will be both discoverable and admissible in any litigation that may arise out of this claim. Failure to preserve this material will result in a request for a spoliation instruction at any trial in this matter.

If you are no longer in possession of these parts, please identify who has or took these parts (and their contact information). Please also share the circumstances under which the parts were removed during the second surgery.





LUIS A. ABREU
ATTORNEY AT LAW

Thank you for your assistance in this matter. If you have any questions, please do not hesitate to call us at 434-791-4677 during regular business hours.

Very truly yours,

Michael D. Simmons

MDS/lrp

Enclosure

cc: Ms. Susan Olival Cardoza (W/O Enclosure)
(VIA Electronic Transmission and U.S. Mail)

Mark C. Hermann, M.D. (W/O Enclosure)
(VIA U.S. Mail)

# LUIS A. ABREU, PLLC

ATTORNEYS AT LAW

Luis A. Abreu
labreu@luisabreulaw.com

Michael D. Simmons
msimmons@luisabreulaw.com

P. O. Box 1598
626 North Ridge Street
Danville, Virginia 24543
www.luisabreulaw.com

(434) 791-4677
Fax: (434) 791-4676

April 18, 2017

VIA Certified Mail, Return Receipt Requested, and Electronic Transmission

DePuy Synthes Joint Reconstruction
700 Orthopaedic Drive
Warsaw, IN 46582

FILED
2018 DEC 13 PM 12:00
CLERK'S OFFICE
CIRCUIT COURT
DANVILLE VIRGINIA

**Preservation of Evidence/ Spoliation Notice**

RE: Our Client: Susan Olival Cardoza
Address: 172 Graymont Place
Danville, VA 24541
Date of Birth: 12/19/1953
Social Security #: ###-##-0687

Dear Sir/Madam:

Please be advised that we represent Susan Cardoza with respect to her injuries sustained from a failed hip replacement performed on December 15, 2016. It is requested that you provide us with a complete copy of your file regarding services or products rendered to Ms. Cardoza. Please also provide us with copies of all documentation relating to the hip replacement and parts used in the hip replacement surgery.

This letter is to also put DePuy Synthes on notice that it must preserve all data of any type relating to the claim. Most importantly, all of the hip replacement parts removed during the operation must be preserved. This includes, without limitation, the CERAMAX Ceramic Insert, BIOLOX Delta Ceramic Femoral Head, and any other part that was replaced on March 10, 2017. We have attempted to contact your employee, Richard Fox with Quality Control, whose name was given to us by the office of the treating physician, Dr. Mark C. Hermann. We were notified by Dr. Hermann's office that Mr. Fox had the pieces described above. We were advised that the Case Number is COM-271-588 and the phone number provided to us for Mr. Fox is 1-866-811-9367. We have left several messages at that phone number but have not received any response or call backs, and we are attempting to notify Mr. Fox and DePuy that any and all parts of the hip replacement removed from Ms. Cardoza's hip after the surgery are to be preserved. Please ensure this letter is provided to the appropriate person in your office who is charged with the custody of the above items.

Please do not dispose of any of this material, as I expect that it will be both discoverable and admissible in any litigation that may arise out of this claim. Failure to preserve this material will result in a request for a spoliation instruction at any trial in this matter.





LUIS A. ABREU
ATTORNEY AT LAW

If you are no longer in possession of these parts, please identify who has or took these parts (and their contact information). Please also share the circumstances under which the parts were removed during the second surgery.

Thank you for your assistance in this matter. If you have any questions, please do not hesitate to call us at 434-791-4677 during regular business hours.

Very truly yours,

Michael D. Simmons

MDS/lrp

cc: Ms. Susan Olival Cardoza (VIA Electronic Transmission and U.S. Mail)

Mark C. Hermann, M.D. (VIA U.S. Mail)